Good morning. May it please the court, Larry Gabriel on behalf of the appellants. What I'd like to do is reserve, I guess I have seven and a half minutes that I'd like to reserve, three minutes for rebuttal. So I'll try to limit my argument here to four. Okay. You have 15 minutes total. Oh, each side has 15 minutes? Yes. Then we're good. You're probably in good shape. Thank you. All right. The district court's ruling is remarkable in any number of reasons. The first is its choice of law and the logic when it ruled that New York law was applicable to this case because there was a choice of law. I found it to be remarkable since there was no connection with New York by the insurer who had offices in Connecticut or by the policyholder who was in California and the policy was issued to a California insured with no nexus to New York whatsoever. The court's reasoning was that Connecticut was close enough to New York and therefore New York law could apply. That may be true for many of the people that live in Connecticut and use it as a suburb of New York, but I think there are state laws there. What's the big difference between New York law and California law that makes it better to apply California law? I think there are policy differences between the two with respect to how insurance policies are treated, particularly so with respect to the implied covenant of good faith and fair dealing. The California law allows for punitive damages. New York does not. If New York law applied, what claims would you have lost? Were there any claims that you could not bring? Yes, the breach of the implied covenant of good faith and fair dealing and the punitive damages claim. There is also some distinguishing differences, I believe, as between how the policies are read in New York and California. And I think to me that's the significant question, is would the policy interpretation turn out any differently? I believe that it would. You would have to show it was ambiguous, the language was ambiguous, right? Correct. And then under both states' law, if it's ambiguous, it would be construed against the insurer. That's correct as well, Your Honor, but that's just the first step of this. The second step is once you get through what the policy says and we're now going to what the settlement agreements say and how that's impacted. In California, you can consider that. Pardon me? In California, you can look at extrinsic evidence. Correct. And in New York, you can't. In New York, you can't. So there's a big difference. Well, you only look at extrinsic evidence if you conclude the language is ambiguous. In both States, you do not look at extrinsic evidence if the language is not ambiguous. Well, I'd also submit, Your Honor, that there is how the payments are considered, the drop-downs are considered. There are nuances between the two laws. I think California is somewhat broader. California is much more defined. Under California law, we have the Diamond Heights case, which I think has just recently, by this Court, been affirmed. And to be applicable, I think the insurers would argue that the logic of Diamond Heights does not apply in New York. I think there is a substantial difference in which the way the courts would read these policies and the rights of the insurers. The insurers as to California law. So putting aside the fact that the courts said, oh, well, the laws are the same, there's no justification for applying New York law just as a matter of law. Saying a State is near another State and, therefore, it's okay to apply it is not appropriate. The Court's reasoning was that, and Reliance was on this 1-800-JUMP case, and that was a summary judgment case. There was factual underpinnings that were presented to the Court that said, look, our business, we are a Canadian corporation, but our business is really located in Washington, and, therefore, Washington lost supply. And they submitted all of these facts to the Court for its jurisdiction. This is not a summary judgment case. This is a motion to dismiss the case. The Court has no right to go out and accept the arguments of Lloyd's, which the Court did, and say, oh, we have all these policy reasons for this, for applying New York law. That wasn't before the Court, couldn't have been before the Court. The Court was limited to the review of the policy in and of itself. Moving on, the next issue in this case is what did RSUI pay? Because the complaint says, and Lloyd's admits now in its reply brief that it said RSUI ultimately paid a total of $3.5 million. They didn't define it in their reply brief. But the complaint specifically shows how the policy was depleted. It was depleted because they paid $3.5 million as settlement cash that actually went to the recipients of the settlement agreement. And they also paid $1.467,515.23. Maybe I have my facts wrong, but I thought in terms of the master settlement agreement, RSUI paid $2 million as part of that settlement agreement. But in addition, it had paid something like $1.5 million in defense costs for a total of $3.5 million. And that was part of the settlement agreement. So they were below the $5 million limits of their insurance policy once they settled this. That interpretation is understandable. It's wrong. Okay. Tell me why it's wrong. And I will tell you why. Having been one of the drafters, one of the, I don't know, 14 or 15 law firms of these settlement agreements, I'm pretty familiar with it. And the two years that it took us to negotiate the terms of this and the year and a half it took us to get final approvals of this most complicated settlement agreement. And the reason that that's wrong is because what that says is the amount of money that was paid, because there was various prongs to the settlement agreement, the debtor, QHL, had to settle with RSUI the rescission lawsuit that it was involved in. In order to do that, QHL paid RSUI $1.5 million. That $1.5 million. You're saying that's actually RSUI's money? They paid that to RSUI. RSUI instructed that money to go into the RSUI distribution trust. So you're saying because that money was owed to RSUI, it was actually RSUI's money, and if you had that money in, that means that RSUI actually paid $5 million? Correct. And what provision in the settlement agreement says that? Okay. And if you look at the settlement agreements, it's at the RSUI settlement agreement, and I'm looking at what is excerpts of record 279 and 280. What's the page of the agreement? Because we have different versions. Well, let's see. It says 3 of 10 and 4 of 10. There should be a page on the right-hand number, lower right-hand. Oh, 279. Okay. 279 of the settlement agreement itself. Right. And so it spells it out here. There's three paragraphs. Pursuant to the terms of the settlement agreement, blah, blah, blah, it says that in paragraph 1, RSUI shall pay the sum of $2 million. Okay. The next one says RSUI paid, in addition, has already paid $1,467,513 as defense costs. The third paragraph, and this is where the issue comes in, says that QHL, with intended business days of the later receipt of the notice of dismissal, blah, blah, blah, and I'll explain all of that, will then make a payment to the U.S. RSUI Policy Limits Exhaustion Trust in the amount of $1,650,000. That money was used by QHL and RSUI to resolve the rescission action between QHL and RSUI. In the negotiations of this agreement, they said, well, we could pay that amount to RSUI and then RSUI could then just fund it, and through the negotiations, it was decided this would be the way that that money would go into the RSUI trust. It was determined that the insured owed, because RUSI had sued the insured for rescission. Correct. And this is based on alleged wrongful actions of the directors and officers. So this money is money RSUI, could RSUI just have kept that money and not used it to pay off the claims against QHL? Well, they could have, but we wouldn't have. They could have kept that money, and we could have said, okay, RSUI, you write a separate check for this amount and put it in the RSUI trust. That could have happened, and it would have been one pocket paying out of another pocket. In order to avoid all of that, which included, by the way, oh, we have to get permission from this person going up the ladder of the insurance companies, and this is going to be a very complicated thing to get it done. There was a gazillion reasons why this was structured in the manner it was. Okay. Let me ask you something. Which is not before the Court, which is a factual issue. Did the insurer give notice to Lloyds of the claim and the outset as required by the Lloyds policy? Everything was done according to the policy. They had notice. They gave notice. Yes. Okay. Was Lloyds invited to participate in these settlement agreements? They were, Your Honor. And they declined? But they did not. They did not. They said, let us know if we should be involved or what have you. It's not only that. Can I just jump in? I want to go back to this. So your clients, RSUI sued your clients to rescind the policy so there would be no coverage. RSUI sued QHL. QHL. My clients were the victims. All right. It sued QHL to erase the policy, rip it up. That's what rescission means. Right. QHL said, okay, we will pay you $1.6 million because we're going to settle our claim against you. So when you say you, I'm sorry. Pay RSUI $1.6 million, right? QHL. To terminate that rescission lawsuit said QHL said we will pay you RSUI $1.65 million. Right. All right. To me that does not communicate that QHL had a strong belief in its defense of the rescission case. But be that as it may, we'll leave that past. So I am mystified about how a separate litigation settlement payment in a rescission suit could ever be construed as a payment under the RSUI policy in terms of crediting it as an exhaustion payment. I just don't see it. The QHL was sued because they had, according to RSUI, it settled, but the allegations were you fraudulently obtained insurance from us and we're seeking to rescind it. All right. That's not unusual in coverage litigation. It is unusual for the defendant to say here's $1.65 million to terminate that rescission claim. No, it's not because we had to settle all of the cases. It wasn't just one settlement. This was a package of complex negotiations. And so we couldn't settle the RSUI case without settling the QHL coverage case. So it was all interrelated. It wasn't an unusual, it was an unusual situation in that this whole case was unusual, but because of the complexities of it. But they did do that. And that was the agreement. And then RSUI agreed to pay $1.65 million to settle the class action case. There's nothing wrong with that. What I'm struggling, I'm not saying there's anything wrong with that. Right. What I'm saying is it doesn't fit the language of the policy. So the Lloyd's policy says, if by reason of the payment of any claims or losses by the insurers of the underlying policies, the amounts of the underlying policy limits are totally exhausted. There's just, there's just, I understand all these other fancy things happened, but the literal language of the Lloyd's policy was not met. The literal language of the Lloyd's policy was met with all due respect, Your Honor. It, the context of the policy is that the, when you say the insured, the insurance company has to pay on behalf of its insured $5 million, either by way of payment of settlement and by, or payment of defense costs because it was a liquidating policy. Okay. They did that. They paid $5 million. They paid the $1.46 million in defense costs. They paid $2 million on one hand. And they paid $1,650,000 that they were otherwise entitled to get. Well, what document from RSUI says we hereby submit $1.65 million pursuant to our policy? Read the settlement agreement. In paragraph four, it says all of the parties, it says, pursuant to paragraph one, two, are deemed by all parties to exhaust the limit of liabilities of RSUI's policy. RSUI made a representation in the settlement agreement that this exhausts our policy. I understand that, counsel, and that seemed very tactical to me in some way, but that doesn't trump the plain language. This is a contract. A bunch of other people saying, oh, here's how we read the contract doesn't change the language that we have to deal with. We deal with the face of this contract. Your Honor, would it make a difference to you if RSUI said, we didn't establish the trust, okay, for purposes of that. And RSUI received $1,650,000 from QHL. And a month later, RSUI pays the class $1,650,000. Is that a difference? Let me ask you this. Let me ask you this. RSUI sued to rescind the contract. It makes very little sense to me that at the same time they just said, oh, and by the way, we will pay you every dollar of coverage. That's what you're asking us to believe. RSUI sued QHL to rip the contract up, but you're saying, oh, no, in fact, RSUI paid every dollar they owed despite suing to set that contract aside. It was to settle the claims. It wasn't to rip the policy up. No, RSUI sued to rip the policy. That's what rescission means. But the payment wasn't made to rip the policy up. It was to settle the claims. The policy still existed. The policy didn't go away. I understand that, but I'm making a different point. Why don't we hear from Lloyds, and you've already taken additional time beyond, but we'll give you some rebuttal time. Thank you very much, Your Honor. Thank you. May it please the Court. Joseph Finnerty from DLA Piper for underwriters at Lloyds that we will call underwriters today for convenience. Judge Donato, you are directly on the hot point at the center of this case. The policy requires exhaustion by the underlying insurers by payment of loss under those policies in order to trigger the excess. The documentary evidence that was before the district court and is before this court proves unquestionably that that did not happen. And the Ipsy Dixit suggestion from counsel in briefing an argument that in some manner, off of the face of documents that are integrated and part of the record, there was some passing of cash that should be counted as exhaustion of this policy is without merit and should not be countenanced. The RSUI settlement agreement that's at issue in this case states clearly and expressly that the parties intend that no payment shall be required from RSUI under the RSUI policy, under the RSUI policy, other than for the payments provided for under paragraphs one and two. As you will recall, counsel was talking about three paragraphs from above. One and two are the $2 million payment that was made by RSUI into the settlement. And paragraph two is the $1,467,000 in defense costs that they had already paid. So what's lying out here is the disputed 1.65, correct? And the effort to construct the artifice of exhaustion is in paragraph three. It states if you take a lot of the words out of the middle of this paragraph, it simply says QHL, then skip down to the third to last line after the comma. I'm sorry, it's. Of the settlement agreement. I'm looking at excerpts of record page 700, which is the operative page of the RSUI settlement agreement, the payment terms in that. I'm sorry, I should have given you the site before I started reading. That third paragraph that counsel was referring to states at the beginning QHL comma. And if we skip down after the words in the paragraph before the very end of the paragraph that just tell when this payment is going to be made, it says QHL, and then third to the last line, will make a payment to the RSUI Policy Limits Exhaustion Trust, which is aptly named for the artifice only, a trust at an attorney's office called the RSUI Exhaustion Trust, only for purposes of giving the appearance of exhaustion. QHL will make a payment to that trust in the amount of $1,650,000. And then we skip down to paragraph five of that same page. And you will see the language that I was quoting when I first began speaking today. After the first sentence, the second sentence reads, the parties intend that no payment shall be required from RSUI under the RSUI policy, other than for the payments provided under paragraphs one and two. Nothing to do with paragraph three as far as the RSUI policy is concerned. The artifice that you're seeing here, Your Honor, is essentially an admission of the law that requires, under the terms of this coverage, requires the exhaustion of those underlying insurers before there will be any trigger. There would be no purpose to create this artifice unless the law required it. I think the key language in your policy is that the payment had to be made by the underlying insurance. That's correct, Your Honor. And the argument is that this $1,650,000 was not really made by the underlying. It wasn't made by RSUI. It was made by the insureds. And in that case. That's precisely right. In that case, the New York law, which is what we've been looking at, I've been looking at, in that case it would read, I think the New York law would read it pretty straightforwardly and say, no, it has to be made by the insurance company itself. And we don't want to have the policy behind that. We don't want to incentivize people to construct settlements to get around terms in the policy. However, I did a lot of insurance law when I was in my private practice days. So if the insurance companies, when you have these excess tiers of insurance, if they wanted to give themselves the leeway to actually engage in settlements where the insureds paid part of that and that was deemed to exhaust the underlying limits of policy below the next excess layer, they could write that into the contract. Yes, they can. Are there such contracts? There are. As a matter of fact, as the evolution of the industry moves, insureds have bargained for manuscripted policies that do precisely that, that allow, it's called limits shaving policies. Okay, but then, so I guess my other question is, though, if you had been brought into this settlement, you might have been part of these discussions or had willingly joined. I don't know what the real situation is here. You also could have agreed as part of this settlement that you would deem this thing to actually satisfy your policy. You could have done that in a separate settlement agreement. That's right, Your Honor. But you didn't participate, and I don't know why. I can explain that. Okay. At that point in time, the understanding from Lloyd's was that the exposure to liability had declined to the point where it would not be necessary for them to take a trip across the country and participate in a mediation. The letter that was written that's part of the record states very clearly that they are available by phone and will reconsider as soon as they get any information that would suggest that their presence was required. The position that they were taking at that point was that all of the evidence suggests to us that you should be able to take care of this settlement in the underlying limits, and that's precisely what happened. They took care of the case within the underlying limits, leaving $1.65 yet to be paid by any insurer. That there was some movement of money without insurance being involved that was done according to some, I'm not sure what, doesn't have anything to do with the fact that the settlement happened without the exhaustion of the underlying insurers as required for these insurers to be triggered. Let me ask you just one other question to fully understand this. So what exactly are Cooper and Sebel suing Lloyds now for this $1.65? Is that what they're suing for? They're suing Lloyds for the full $5 million value of the Lloyds policy. And the argument there is that the underlying settlement that they entered into was nominally $10 million. And they got $5 million from others, and they assigned QHL, the owner of the policy, assigned a right to pursue the Beasley-Lloyds underwriter's policy to the plaintiffs. So the plaintiffs have taken the cudgel of that as a gift in the settlement. Only what they got was a policy that was never triggered. So the nominal valuation of $10 million, 5 in real cash from other insurers and from QHL, plus a right to pursue Lloyds for a nominal 5. But what was missing from the calculation as they named it, 10, was the fact that that top Lloyds policy had not been triggered because the terms of coverage under that policy never got triggered because there was not an exhaustion of the underlying limits. And why wasn't there an exhaustion of the underlying limits? Because the settlement didn't require it. And that goes to the fact that Lloyds never needed to be present at that settlement. What happened at the settlement— So do you think the real value of the claims against QHL was that $5 million? Or do you think it was ever actually $10 million? That is correct, Your Honor. The letters that were exchanged as of the date that's in the record state, we're not planning to attend because the estimate of liability exposure and damages exposure in this case has declined since the last we met about this. We think it could be handled within the limits of the underlying insurance. If it can't, please call us. We'll get on the phone. We'll deal with it. What happened is— Well, let me ask you with respect to the choice of law. Leaving aside punitive damages, with respect solely to interpretation of these agreements, does it make any difference whether you're under California or New York? None whatsoever, Your Honor. Qualcomm, the case in the appellate court in California, and the other cases in New York that we've cited, Ali Mehdi against Federal Insurance Company, hold the exact same. That, indeed, if the language of the policy so provides, you must exhaust the underlying insurance by payment from the underlying insurers in order to trigger the coverage. There's no difference whatsoever. And that's true because the same— In terms of who is actually paying and exhausting, that's just a question of who the insurer is. That's right. You look—the terms of coverage usually identify those precise policies that are there. Correct. If those policies pay according to the terms, then the excess is triggered. If they don't pay according to the terms, the excess is not triggered. Let me ask you. So on the—I see—I read from 5B on the total exhaustion, but there's also a—this is the Lloyds policy. There's also a 5A that refers to partially reduced. What do you understand that clause to mean? That means that we—it's essentially saying we remain not triggered but still here if the underlying limits are partially reduced. In other words, it's reiterating that the ultimate— that that underlying insurance has to be fully exhausted before we're triggered. Well, what I'm not understanding is this policy will continue to apply in excess of the reduced amounts of the underlying policy limits. What specifically? In excess of what's left on that policy. In other words, it's saying if, say, it's 5 million policies like here and 3 million have been eaten by defense costs, we will stay in force in excess of the 2 million left. That's it. Okay. All right. Or it could be another case, right? Or it could be another case.  And that's the reason for that language. It doesn't— It could be sued for another— If there's another notification of another case, we would still be live above you, but you have to still get rid of that extra 2 million before we're triggered. So you've bargained to always keep a $5 million requirement. In this policy, that's exactly what happened. It was a contractual obligation of the insured to get $5 million out of that policy before it got to us. The only other point that I would like to address is the choice of law suggestion that the bad faith law is different. I think that was provocative. And the only point that I would like to make is that there is no bad faith here because as a matter of Hornbook California law, if indeed the excess insurers are not triggered, as was not the case here for the reasons that we've been discussing, then there is no obligation of the excess insurer to participate in the settlement. Therefore, a failure to participate before the exhaustion or commitment to exhaust of those underlying insurers provides for no obligation on the part of the excess insurer. Therefore, it cannot be bad faith to not participate in a settlement. So they notified you of the claim, right? They say they notified you of the claim. They notified us of the claim during the policy. There was this claim, but they never gave you reason to believe it was going to exceed, I guess, the first $10 million. That's right. We had notification of the claim, paid attention to the claim, listened to defense counsel, followed what was going on because we had a notification and an insurance company opens a file to make sure and watch what's going to happen. And that assessment regularly made decided that there was, at the point the mediation was coming and throughout, there was no likelihood that the liability exposure would render a reasonable settlement within the limits of the excess. So the determination was made we will not come to the mediation. I see, oh, it's only yellow. We will not come to the mediation, but listen, we're ready to come if you call us or tell us something has changed in the facts that suggest that we should participate. And it never happened that the settlement got through the underlying insurance. It stayed where the value was estimated by the excess. And the only reason we're here is because there's a constructed argument through the artifice of this settlement agreement to create the appearance of exhaustion that never happened. With that, thank you very much, Your Honor. Thank you. I'll give you a minute for rebuttal. I'll do this very quickly. Thank you, Your Honor. Let me direct a couple of things. Number one, this discussion indicates that there is factual issues that must be determined before this case can be adjudicated. There is understandings, there is negotiations, there's discussions between the parties, and the Court cannot say based on a reading of this document as to what the intent of the parties were and how this was to be implemented. That's number one. So at best, the Court erred and said, oh, I can understand this. We've just had an hour discussion that says there's a lot of difference of opinions as to the underlying facts. Counsel's testimony about what that company knew and how they acted is not accurate. I have declarations on file in the bankruptcy court that said these claims were worth in excess of $30 million. These claims were not under $5 million. They weren't under $10 million. That's number two. And so the underlying claims, there was a lot of discussions on this. I respectfully, Judge, disagree with your contention about these payments. But even if you accepted that, go back and read the insurance policy and it says payments by the insured, okay, or it could be the insurance company's insured. In this case, QHL was the insured. So if you want to say that they didn't pay, that RSUI didn't pay it, the insured paid the money. RSUI was obligated to pay QHL back. And, therefore, that would have been a depletion of the policy. And if you go back and you look at the Telefax marketing case, which this Court just decided, you'll see that it's a payment obligation not paid or obligated to be paid. So you've exceeded your time and we have your points well in mind. Plus, we do have, of course, extensive briefing. So thank both counsel for your arguments this morning. The case of Cooper Sobel v. The Underwriters is submitted.
judges: McKeown, Wardlaw, Donato